## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

CONSENSUS ADVISORY SERVICES LLC,　　　)
and CONSENSUS SECURITIES LLC,　　　　　)
　　　　Plaintiffs　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
NATIONAL STORES, INC.,　　　　　　　　　)
　　　　Defendant　　　　　　　　　　　　　)

## COMPLAINT

### Parties

1.　　The Plaintiff Consensus Advisory Services LLC (collectively, with the Plaintiff Consensus Securities LLC, "Consensus") is a limited liability company organized under the laws of the Commonwealth of Massachusetts, with a principal place of business located at 73 Newbury Street, Boston, Massachusetts.

2.　　The Plaintiff Consensus Securities LLC (collectively, with the Plaintiff Consensus Advisory Services, LLC, "Consensus") is a limited liability company organized under the laws of the Commonwealth of Massachusetts, with a principal place of business located at 73 Newbury Street, Boston, Massachusetts.

3.　　The Defendant National Stores, Inc. ("National Stores") is, upon information and belief, a corporation organized under the laws of the State of California, with a principal place of business located at 15001 South Figueroa Street, Gardena, California.

**Jurisdiction and Venue**

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. 1332 because there exists complete diversity of citizenship between Consensus and National Stores, and the amount in controversy exceeds the statutory threshold of $75,000.00, exclusive of interest and costs.

5.    This Court has personal jurisdiction over National Stores because National Stores maintains retail operations in Massachusetts, and through those operations conducts systemic business transactions in Massachusetts and avails itself of the laws of the Commonwealth.

6.    Venue is proper in this Court because National Stores does business in this District within the meaning of 28 U.S.C. 1391(b).

**General Allegations**

7.    Consensus repeats, realleges and incorporates by reference the foregoing allegations.

8.    At all times pertinent hereto, Consensus was in the business of providing commercial organizations with financial advice and strategic counselling in connection with liquidity, debt and capital needs and transactions.

9.    On or about March 2, 2012, Conway Stores, Inc. (Conway Stores"), a fashion apparel discount chain, engaged Consensus to provide it with such advice and counselling.  At the time, Conway Stores was not profitable and had recently acquired 45 new stores in a transaction with The TJX Companies, Inc. and re-opened these stores under the new trade banner "CW Price."  There are 8 CW Price stores in Massachusetts.  Conway Stores sought Consensus's guidance and

assistance on matters relating to its ongoing capital structure, including potentially raising capital to grow the CW Price concept.

10. On or about March 2, 2012, Conway Stores and Consensus entered into a written contract ("the Contract"), which outlined in detail the services Consensus was to provide Conway Stores, as well as the compensation Consensus would earn for such services. See Contract attached hereto as Exhibit 1.

11. The Contract, in relevant part, provided Consensus was to "[identify] sources of debt and/or equity from commercial lenders and/or institutional, industry and/or accredited investors to facilitate such needs" (designated "Target Investors"), and to "[participate] on [Conway Stores'] behalf in negotiations concerning any such liquidity and capital transactions or relationships" (designated "Transactions").

12. The Contract further provided that if Consensus were "successful," defined as Conway Stores entering into and consummating a Transaction with a Target Investor, Conway Stores would pay Consensus a fee of $750,000.00 (less a $75,000.00 retainer paid by Conway Stores at execution), with such fee due and payable at the closing of the Transaction.

13. The Contract called on Consensus to compile a list ("the List") of proposed Target Investors to present to Conway Stores. The List included National Stores. See List attached as Exhibit 2.

14. Conway Stores' business continued to deteriorate during Consensus' engagement, and the CW Price concept did not materialize into a profitable business as management had hoped. As performance deteriorated, Conway Stores asked

Consensus to focus on strategic partners who might have interest in acquiring the business on an expedited basis.

15. Consensus thereafter solicited multiple potential acquiror candidates and entered into detailed negotiations for a proposed capital transaction with two parties, one of which was National Stores.

16. Consensus' solicitations and negotiations over the course of two years resulted in National Stores first lending money to Conway Stores so that Conway Stores could repay the debts it owed its primary lender, First Niagara Bank, and thereafter purchasing, upon information and belief, all the operating assets of Conway Stores and merging the operations of the two concerns.

17. Throughout the process, Consensus was heavily involved in the Transaction, signing non-disclosure agreements with National Stores, analyzing lease and inventory values, and corresponding and counseling extensively with both parties and their representatives during negotiations.

18. On January 9, 2014, upon information and belief, National Stores entered into a formal Letter of Intent ("LOI") to acquire Conway Stores. Consensus was not privy to the LOI.

19. On February 1, 2014, Abe Cohen ("Cohen"), President of Conway Stores, emailed Michael O'Hara ("O'Hara"), Managing Partner of Consensus, and gave assurances National Stores would pay Consensus the fee owed under the Contract. In the email, Cohen stated to O'Hara "I know you're concerned about the Consensus fee. The LOI clearly states that National [Stores] has to pay it." Cohen further assured O'Hara "I will make sure that you are in [the] agreement

before the closing and we have something binding National [Stores] in the event some of the payment is after closing." See February 1, 2014, email attached as Exhibit 3.

20.    On April 3, 2014, Cohen emailed O'Hara and confirmed the attorney documenting the asset purchase agreement "has [Consensus] as the broker on the deal written into the asset purchase agreement." See April 3, 2014, email attached as Exhibit 4.  Consensus was not privy to the asset purchase agreement.

21.    On or about April 13, 2014, upon information and belief, National Stores purchased Conway Stores' tangible and intangible assets, inventory, goodwill, customer lists, accounts receivable, trademarks and records, assumed its business locations, operations and leases, retained many of its employees, and closed its headquarters.

22.    Upon information and belief, prior to the purchase of assets and the merger of operations, Conway Stores operated approximately 90 retail stores across the central and eastern United States, and National Stores operated in excess of 200 retail stores across the western United States (and is known to be opening stores in new markets such as Chicago and Florida).  After the merger, upon information and belief, National Stores own and operate in excess of 300 stores.

23.    From April 13, 2014, to April 18, 2014, O'Hara corresponded (verbally and by email) with Sandy Menichelli ("Menichelli"), Chief Financial Officer of National Stores, concerning payment of the fee owed Consensus by National Stores.  In the correspondence, Menichelli expressly acknowledged the debt owed Consensus, as well as National Stores' liability therefor, and asked O'Hara if Consensus would

consider discounting the fee. In fact, Menichelli initially proposed tender of $200,000.00 from National Stores to Consensus as payment in full of Consensus' fee. O'Hara responded by detailing the extensive work Consensus had performed over the previous two years leading to the Transaction, and offered a partial deferment (without discount) as an accommodation. Menichelli thanked O'Hara for his response, and indicated she would review the proposal with National Stores' president, Michael Fallas, and get back to him. See April 18, 2014, email exchange attached as Exhibit 5.

24.    O'Hara thereafter made numerous inquiries to Menichelli concerning payment, but Menichelli and National Stores first failed to respond to the proposal and, when they ultimately addressed it, reiterated their previously rejected offer.

**Count I**
**Breach of Contract/Successor Liability**

25.    Consensus repeats, realleges and incorporates by reference the foregoing allegations.

26.    Consensus and Conway Stores entered into a valid and binding Contract supported by good and adequate consideration.

27.    Consensus performed its obligations and honored all covenants under the Contract, *viz*, it facilitated and procured a "Transaction" between Conway Stores and National Stores, a "Target Investor," and the Transaction was consummated.

28.    Consensus is thus owed $675,000.00 ($750,000.00 less the $75,000.00 retainer) under the terms of the Contract.

29.    National Stores is the successor to Conway Stores by virtue of the fact that it
       acquired Conway Stores' assets and good will, purchased its inventory, and
       retained its employees and management.    National Stores' acquisition therefore
       represents a de facto merger with Conway Stores, as there is continuity of
       personnel, physical location, assets and general business operations.  National
       Stores is also a successor to Conway Stores because its acquisition represents a
       "mere continuation" of Conway Stores' business.

30.    National Stores, as successor to Conway Stores, is liable for the Contract, and
       breached the contract by failing/refusing to pay Consensus' fee under the
       Contract.

### Count II
### Breach of Contract/Third Party Beneficiary

31.    Consensus repeats, realleges and incorporates by reference the foregoing
       allegations.

32.    Conway Stores and National Stores entered into a contract, an asset purchase
       agreement, which, in relevant part, provided that National Stores would pay the
       fee owed Consensus under the Contract, as evidenced by the written assurances
       and statements of Cohen to O'Hara and Consensus.  See February 1, 2014, email
       and April 3, 2014, email attached as Exhibits 3 and 4.

33.    Consensus, therefore, was a third party beneficiary of the contract between
       Conway Stores and National Stores.

34.     National Stores breached its contractual obligations to Consensus as a third party beneficiary by failing/refusing to pay Consensus' fee under the Contract, as required by the asset purchase agreement.

**Count III**
**Assumption of Liability**

35.     Consensus repeats, realleges and incorporates by reference the foregoing allegations.

36.     National Stores expressly and impliedly assumed the debt owed to Consensus, as evidenced by verbal and written statements of Menichelli to O'Hara and Consensus and the April 18, 2014, email exchange between Menichelli and O'Hara.  See April 18, 2014, email exchange attached as Exhibit 5.

37.     National Stores is thus liable to Consensus for the fee owed Consensus under the Contract.

**Count IV**
**Unjust Enrichment**

38.     Consensus repeats, realleges and incorporates by reference the foregoing allegations.

39.     This Count IV is advanced in the alternative.

40.     National Stores was enriched through Consensus' services to Conway Stores in that Consensus identified National Stores as a Target Investor, and thereafter solicited and entered into negotiations with National Stores for the eventual Transaction with Conway Stores.

41.     National Stores was so enriched at Consensus' expense.

42. National Stores expressed appreciation and knowledge of the enrichment as evidenced by the correspondence between Menichelli and O'Hara on April 18, 2014. See April 18, 2014, email exchange attached as Exhibit 5.

43. Consensus had a reasonable expectation that it would be paid for its work by National Stores.

44. It is against equity and good conscience to permit National Stores to avoid payment of Consensus' fee.

WHEREFORE, Consensus respectfully requests that this Honorable Court:

1.     Enter money judgment for Consensus as to damages sustained under the Contract, together with interest and costs;

2.     Award all other relief this Honorable Court deems appropriate.


THE PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE


The Plaintiffs,
by their Attorney,

*/s/ David W. Krumsiek*

David W. Krumsiek
(BBO # 564564)
Perry, Krumsiek & Dolan, LLP
210 Union Wharf
Boston, MA  02109
(617) 720-4300

Dated: June 13, 2014

# EXHIBIT 1

<u>ENGAGEMENT AGREEMENT</u>

March 2, 2012

<u>Via Electronic Mail</u>
Mr. Abe Cohen
President
Conway Stores, Inc.
39 West 37th Street
New York, N.Y.  10018

Dear Abe:

This letter sets forth the agreement between Consensus Advisory Services LLC and Consensus Securities LLC, both Massachusetts limited liability corporations (together, "<u>Consensus</u>"), on the one hand, and Conway Stores, Inc., a New York corporation (together with all of its subsidiaries and persons and legal entities controlled by it now or hereafter existing, the "<u>Company</u>"), on the other.

1.  <u>Exclusive Engagement</u>.

   The Company hereby engages Consensus as the Company's sole and exclusive financial advisor for the purpose of (i) reviewing and analyzing the Company's business plan and capital needs, (ii) providing strategic advice with respect to financial structure and strategic alternatives including, with respect to the structure, pricing and terms and conditions of the Transaction; and (iii) identifying sources of debt and/or equity from commercial lenders and/or institutional, industry and/or accredited investors (the "<u>Target Investors</u>") to facilitate such needs and (iv) participating on the Company's behalf in negotiations and meetings concerning any such liquidity, debt and capital transactions. The term "<u>Transaction</u>" means, whether in one or a series of transactions, a debt or equity investment by a Target Investor in the Company.  Consensus shall conduct due diligence on the Company's financial and operational elements, but shall neither audit any such data, nor perform appraisals of any of the Company's tangible or intangible assets. Consensus shall assist the Company in preparing appropriate marketing materials for distribution to potential investors, describing the Company and its business, operations, properties, financial condition and prospects, to assist in any Transaction (the "<u>Information Memorandum</u>").  Consensus shall present the Company with a list of proposed Target Investors from time to time (the "<u>List</u>"), and the Company shall have the right to direct Consensus not to communicate with any party on the List in its sole discretion.

2.  <u>Information from the Company</u>.

   The Company shall (i) furnish to Consensus the names of all parties, if any, with whom it has had, prior to the date in this agreement, or has, at any time during the term of Consensus's engagement hereunder, discussion or contacts concerning a transaction of the type described herein (such parties' names shall be hereby deemed to have been added to the List); (ii) make available to Consensus all information concerning the business, assets,

operations and financial condition of the Company that Consensus reasonably requests in connection with the performance of its obligations hereunder and (iii) provide Consensus with reasonable access to the Company's officers, directors, employees, accountants and other advisors and agents as Consensus shall reasonably deem appropriate.

The Company represents and warrants that all such information furnished by it or on its behalf shall be true, complete and correct in all material respects, to the Company's knowledge, and shall not contain any misstatement of material fact or omit to state any material fact required to be stated therein or necessary to make such statement not misleading. The Company further represents and warrants that any projections and other information provided by it to Consensus or to any third party pursuant to the activities contemplated by this agreement shall be prepared in good faith and shall be based upon assumptions that are reasonable, in light of the circumstances under which they are made. The Company recognizes and confirms that, in advising the Company and in completing its engagement hereunder, Consensus is using and relying on information, data, and material furnished to it by the Company and its representatives. It is understood that, in performing under this agreement, Consensus may assume and rely upon the accuracy and completeness of, but has not assumed any responsibility to independently verify the accuracy or completeness of, such information, data and material so furnished. The Company shall promptly notify Consensus if the Company learns of any material inaccuracy or misstatement in, or any material omission from, any such information furnished by the Company or any of its agents of advisors, to Consensus.

3. **Confidentiality Agreements.**

The Company hereby authorizes the negotiation and execution by Consensus on behalf of the Company of confidentiality agreements (on a form acceptable to the Company) to be entered into by third parties in connection with any proposed Transaction if they are listed on the List and have not been excluded from the List by the Company. Consensus agrees to only use information provided by the Company for the purpose of its engagement hereunder and not to disclose any information concerning the Company to any third party except (1) as contained in any disclosure document authorized by the Company to be delivered to Target Investors (including the Information Memorandum and/or a summary thereof commonly referred to as a "teaser"), (2) set forth in any data room or made part of a due diligence package, as approved by the Company or (3) otherwise approved by the Company.

4. **Term of Engagement.**

This agreement and Consensus's engagement hereunder may be terminated by either the Company or Consensus at any time with or without cause by giving the other party at least 10 business days prior written notice; provided, however, that notwithstanding any such termination, Consensus shall be entitled to retain the Retainer set forth in Section 5.1 and the full fees contemplated by paragraph 5.2 in the event that at any time prior to the effective date of such termination or within 9 months following such termination a Transaction involving the Company and a party set forth on the List is consummated who: (i) Consensus, with the consent of the Company, has contacted with respect to the Transaction during the term of this engagement, (ii) is annotated on the List as having been contacted (or who was on the List and was not contacted at the request of the Company) or (iii) has entered into discussions regarding the Company with Consensus and/or the principals of the Company. In the event Consensus terminates this agreement

without cause prior to completing the Information Memorandum and approaching a substantial portion of parties on the List, the retainer paid under Section 5.1 shall be returned to the Company.

5. **Compensation.**

    5.1    <u>Retainer</u>: $75,000.00 earned upon, and payable contemporaneously with, the execution of this Agreement by the Company.

    5.2    <u>Transaction Success Fee</u>: In the event the Company shall elect to enter into and consummate a Transaction in its sole discretion, the Company shall pay to Consensus a fee equal to $750,000. In the event the Company enters into a Transaction with any investor that is not on the List or with an investor that is not introduced by Consensus, including without limitation Goode Partners, and a letter of intent with such party is executed on or before May 1, 2012 and a transaction is ultimately consummated on substantially similar terms as the term sheet, then the Transaction Success Fee shall be reduced to $500,000. The retainer paid under Section 5.1 shall be credited against the Transaction Success Fee due and payable under this Section 5.2.

    5.3    <u>Timing and Form of Payment; No Fee Sharing</u>: Compensation which is payable to Consensus pursuant to paragraph 5.2 shall be paid by the Company to Consensus at the closing of the applicable Transaction by wire transfer or check payable in immediately available funds. The Company agrees that it shall make no agreement with any brokers, representatives or other persons pursuant to which such persons would have an interest in compensation due from the Company to Consensus in connection with any transaction contemplated by this agreement.

6. **Independent Contractor.**

Consensus is performing under this agreement as independent contractors with no fiduciary or agency relationship to the Company or any other party.

7. **No Undertaking or Commitment to Provide Financing.**

The fees set forth in paragraph 5 above shall be in addition to any other fees that the Company may be required to pay, directly or indirectly, to any other party (such as lawyers, accountants, lenders, etc.) for a transaction. This agreement does not constitute a commitment or undertaking on the part of Consensus to provide any part of the funding in a Transaction and does not ensure the successful arrangement or completion of any such transaction or any portion thereof.

8. **Expense Reimbursement.**

In addition to any fees payable by the Company to Consensus hereunder, the Company shall, whether or not any Transaction shall be proposed or consummated, reimburse Consensus on a monthly basis in arrears, within 15 calendar days of the submission of an invoice therefor, for Consensus's actual reasonable out-of-pocket expenses incurred in connection with or arising out of Consensus's activities under or contemplated by this engagement during such preceding month. Out-of-pocket expenses shall include, but not

be limited to, reasonable fees, disbursements and other charges associated with Consensus's travel and lodging expenses, outside database charges, legal fees, to the extent that any such counsel or advisors have been retained with the prior consent of the Company (not to be unreasonably withheld) communication charges, document production charges, electronic data room charges, courier services and other necessary expenses. Notwithstanding anything to the contrary, Consensus shall seek the Company's consent prior to incurring expenses in excess of five thousand dollars ($5,000.00) in the aggregate, and in no event shall the total expenses exceed ten thousand dollars ($10,000.00) in the aggregate.

9. <u>Advertisements.</u>

The Company agrees that, following the completion of any Transaction contemplated hereby, Consensus shall have the right, subject to the Company's prior approval as to content, which approval shall not be unreasonably withheld, conditioned or delayed, to place advertisements in financial or industry trade periodicals and other newspapers and journals, at its own expense, describing its services to the Company hereunder. Additionally, Consensus may identify the Company as a client in its marketing materials and on its website.

10. <u>Governing Law and Jurisdiction.</u>

This agreement shall be deemed to have been made in the State of New York.

11. <u>Indemnity; Arbitration; Entire Agreement; Amendments.</u>

The Company shall indemnify and hold harmless Consensus and any of its controlling persons, directors, officers, employees and agents, and each of their respective successors and assigns, from and against any losses, claims, damages, liabilities, obligations, penalties, judgments, awards, costs, expenses and disbursements (and any and all actions, suits, proceedings and investigations in respect thereof and any and all legal and other costs, expenses or disbursements in giving testimony or furnishing documents in response to a subpoena or otherwise), including, without limitation, the costs, expenses and disbursements, as and when incurred, of investigating, preparing or defending any such action, suit, proceeding or investigation (whether or not in connection with litigation in which Consensus is a party), directly or indirectly, caused by, relating to, based upon, arising out of or in connection with the Company's conduct and Consensus's services to the Company hereunder, provided that Consensus has not provided such services in a fraudulent, intentionally malfeasant or grossly negligent manner.

Except for a breach by Consensus of its obligations of non-disclosure under Section 3 hereof, the parties agree to the dispute resolution provisions of <u>Exhibits A</u> hereto. This letter shall constitute the entire agreement between the parties hereto. This agreement shall be binding upon and inure to the benefit of any successors and assigns of the Company and Consensus. This agreement may be executed via facsimile transmission and may be executed in separate counterparts, each of which shall be deemed to be an original and all of which together shall constitute a single instrument. This agreement may not be amended or modified except in writing, signed by each of the parties hereto. In the event of a breach or threatened breach by Consensus of its non-disclosure obligations under Section 3 hereof, the Company may suffer irreparable harm and may be entitled to injunctive and other equitable relief without the necessity of posting a bond. The

Company's right to injunctive and other equitable relief shall survive termination of this Agreement without limit as to time.

We are pleased to accept this engagement and look forward to working with the Company. Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed duplicate copy of this letter, which shall thereupon constitute a binding agreement between Consensus and the Company.

CONSENSUS ADVISORY SERVICES LLC

By: _____
    Michael A. O'Hara
    Managing Member

CONSENSUS SECURITIES LLC

By: _____
    Michael A. O'Hara
    Managing Member

ACCEPTED AND AGREED TO:
CONWAY STORES, INC.

By: _____
    Abe Cohen
    President

Dated: 2/22/12

**EXHIBIT A**

### Dispute Resolution Agreement

(a) <u>General</u>.  Any dispute arising out of or relating to the application, enforcement or interpretation of the terms and provisions of this Agreement (collectively, a "Dispute"), shall be resolved in accordance with the process and procedures set forth in this Exhibit A;

(b)    <u>Good Faith Negotiations</u>.      In the event of a Dispute, the parties shall in the first instance attempt in good faith to resolve it promptly by discussions and negotiation between Senior Executives who have authority to settle the Dispute. Either party shall give the other party written Notice of the Dispute and within fifteen (15) days after delivery of the Notice, the receiving party shall submit to the other a written response. The Notice and response shall include: (i) a statement of that party's position and a summary of the arguments supporting that position, and (ii) the name and title of the Executive that will represent that party and any other person, other than legal counsel who shall not attend any meeting, that will accompany the Senior Executive. Within thirty (30) days after delivery of the initial notice, the Senior Executives of both parties so determined shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the Dispute.

All negotiations made pursuant to this clause are confidential and shall be treated as such by the parties.

(c) <u>Mediation</u>.  In the event the parties are unable to resolve such Dispute through good faith negotiation in accordance with Section (b), then the parties agree to submit the Dispute to mediation within 30 days.  The parties agree to mutually select a mediator and such mediation shall be conducted in New York, NY.

(d) <u>Arbitration</u>.  In the event the parties are unable to resolve the Dispute within 30 days through mediation in accordance with Section (c) above, then the parties agree to submit the Dispute to binding arbitration conducted expeditiously in accordance with the *American Arbitration Act*. The place of arbitration shall be New York, NY.  The arbitration shall be conducted by a single arbitrator experienced in investment banking and company sale transactions.  The arbitration shall commence within 60 days after the date on which a written demand for arbitration is filed by any party. In connection with the arbitration proceeding, the arbitrator shall have the power to order the production of documents by each party and any third-party witnesses. In addition, each party may conduct limited discovery prior to the arbitration hearing as follows: (a) exchange of witness lists and copies of documentary evidence and documents relating to or arising out of the issues to be arbitrated, (b) depositions of all party witnesses, and (c) such other depositions as may be allowed by the arbitrator upon a showing of good cause.  Depositions shall be conducted in accordance with the Federal Rules of Civil Procedure.  The arbitrator's decision and award shall be made and delivered within two months of the selection of the arbitrator.  The arbitrator's decision shall set forth a reasoned basis for any award of damages or finding of liability.  The arbitrator shall not have power to award damages in excess of actual compensatory damages and shall not multiply actual damages or award punitive damages, and each party hereby irrevocably waives any claim to such damages. Each party shall be responsible for its own fees and expenses and one-half of the fees and expenses of the arbitrator, except that the arbitrator may award fees to the winning party if he or she determines the equities favor such an award.

# EXHIBIT 2

**CONWAY STORES**
**PRELIMINARY CONTACT LIST**

1. Acon Investments
2. Advent International
3. Alaris Royalty Fund
4. Alvarez & Marsal/Wahoo Capital/Gabriel Stores
5. Angelo Gordon
6. Ascena Brands
7. Berkshire Partners
8. Big Lots
9. Birch Hill Partners
10. Brentwood Partners
11. Brockaway Moran
12. BRS Bruckmann Rosser Sherril
13. Burlington Coat Factory (Bain Capital)
14. Castanea
15. Catterton
16. CCMP Partners
17. Centre Partners
18. Champlain Capital
19. Citi Trends
20. Compass Equity
21. Dollar General
22. Dollarama
23. Dr Jay's
24. DSW
25. Fallas/National Stores
26. Family Dollar
27. Forever 21
28. Forman Mills
29. Freeman Spogli
30. Gart Capital
31. Genuity Capital
32. Global Reach Capital (Chris Burch)
33. Golden Gate Capital
34. Goode Partners
35. Gordman's (Sun Capital)
36. Gores Group/Mexx Stores
37. Gryphon Investors
38. H&M

39. Harvest Partners
40. HIG Capital
41. Inditex/Zara
42. Irving Place
43. JH Partners
44. KarpReily (incl. XS Cargo)
45. Kohl's
46. Le Chateau
47. Lee Equity Partners
48. Leonard Green & Partners (BJ's and 99 Cent Stores)
49. Lincolnshire Management
50. LLR Partners
51. LNK Partners
52. Loehmann's (Versa/Crystal)
53. Marlin
54. National Stores/Michael Fallas
55. NRDC (Lord & Taylor and Hudson's Bay)
56. Ocean State Job Lot
57. Ontario Teacher's Pension Fund/OMERs
58. Palladin Capital
59. Ross Stores
60. Salus Capital
61. Schottenstein Organization (DSW, Value City, etc)
62. Sentinel Partners
63. Stage Stores
64. Stein Mart
65. Stephens, Inc.
66. Sycamore
67. TA Associates
68. Target
69. TPG Growth
70. TSG
71. Tuesday Morning
72. Uniqlo
73. Variety Wholesalers
74. Vestar
75. Walmart
76. Weston Presidio
77. Westview Capital
78. Yucaipa

# EXHIBIT 3

**Michael O'Hara**

| | |
|---|---|
| **From:** | Abe Cohen <amc123@aol.com> |
| **Sent:** | Saturday, February 01, 2014 9:05 PM |
| **To:** | Michael O'Hara |

Mike, sorry I didn't get back to you earlier in the week. Trying to  move this thing along at Michael's pace has been a full time job! I know you're concerned about the Consensus fee. The LOI clearly states that National has to pay it. As we discussed, I'm sure Michael will try and negotiate the number but I will make sure that you are in agreement before the closing and we have something binding National in the event some of the payment is after closing. You have my word on this. Let's just all work together to get this thing closed! Thanks for dealing with his craziness and keeping your cool!

Regards,
Abe

# EXHIBIT 4

## Michael O'Hara

**From:**            amc123@aol.com
**Sent:**            Thursday, April 03, 2014 5:04 PM
**To:**              Michael O'Hara
**Subject:**         Re:


Hi Mike, not yet but we're real close. I think we'll close Monday/Tuesday next week. Eli has you as the broker on the deal written into the asset purchase agreement. I think at this point you should call Michael directly. Please try to reach him ASAP and let me know what he says.

Regards,
Abe


-----Original Message-----
From: Michael O'Hara <mohara@consensusadvisors.com>
To: Abe Cohen (amc123@aol.com) <amc123@aol.com>
Sent: Thu, Apr 3, 2014 4:56 pm

Hi Abe:  deal close yet?

I reached out to Sandy but she never got back to me other than to say she was swamped.

Mike

---

Michael A. O'Hara | Consensus | 73 Newbury Street, Boston, MA 02116
Direct: +1.617.437.6510 | Main: +1.617.437.6500 | Mobile: +1.781.354.2281 | Fax: +1.617.437.6506
mohara@consensusadvisors.com | www.consensusadvisors.com |  Boston ∞ New York

# EXHIBIT 5

**Michael O'Hara**

| | |
|---|---|
| **From:** | Sandy Menichelli <smenichelli@nationalstoresinc.com> |
| **Sent:** | Friday, April 18, 2014 1:08 PM |
| **To:** | Michael O'Hara |
| **Cc:** | Abe Cohen (amc123@aol.com) |
| **Subject:** | RE: Conway Invoice |

Mike,

Thank you for your response. I will review it with Michael when he returns to the office on Thursday of next week. I appreciate your patience.

Enjoy the holiday!
Best,
Sandy

**From:** Michael O'Hara [mailto:mohara@consensusadvisors.com]
**Sent:** Friday, April 18, 2014 8:42 AM
**To:** Sandy Menichelli
**Cc:** Abe Cohen (amc123@aol.com)
**Subject:** FW: Conway Invoice

Sandy:

I hope you are having a good week and things with Conway are beginning to settle down for you. We had a really successful consumer brand event on Wednesday at the Nasdaq, but it was exhausting! We enjoyed it immensely, but I must say that I am glad it is now over and behind us until next year.

I am attaching a formal invoice for our services on the Conway transaction. We met as a group to discuss your request that we discount our fees. In general, while we want to be good friends to the Fallas organization, it is hard for us to offer up a meaningful discount to our fees for a handful of reasons:

1. Abe and his family negotiated us down from our original fees significantly at the time we signed the agreement 25 months ago. Our success fee, therefore, already reflects a discount.
2. As mentioned, the engagement began 25 months ago. Aside from a retainer, we have received no other compensation.
3. We staffed the project with 4 partners, each of whom put significant time into the project(s).
4. The ultimate project was very different from what we signed up for. Recall that we started out looking to raise capital for the new CW Price concept. While the engagement agreement clearly contemplates advising Conway on any possible transaction that would benefit the organization, the ultimate transaction was really a tidal shift in project scope. We never balked at being involved in that; re-engaged on the new transaction without asking for a new retainer and never abandoned the Company throughout the process.
5. As you were kind enough to say when we spoke on the phone, our services were professional throughout and we played an important role in helping the family come to the conclusion that the Fallas organization was the right partner and that the deal on the table was the best available under the circumstances. We played a big role in the flow of information and a bigger role behind the scenes.
6. Finally, the biggest reason why we cannot support a meaningful discount is our own cash position. We are a small firm and take on relatively few assignments in any one year. Like all other investment banking firms (as you know very well), we absorb losses on those transactions that never close, regardless of our efforts, and we rely on those that do transact to cover our business operations (and the personal expenses of the families of our

employees).  The Conway deal absorbed significant resources over a 2 year period, carrying with it real opportunity cost  for our firm.  Unfortunately for us, a couple of other deals profiled similarly during the same time period.  We are, for example, still looking to get to signatures on a deal we started working on in August 2011!  Consequently, the cash that is owed to us under the engagement agreement is really important to us.

We know the Fallas organization to be very successful and we believe that while you are always looking for the best deal possible (it is why you are so great at what you do!), we believe you are in a position to pay our modest fee in full.

Notwithstanding this, we are willing to defer some of our fee as a gesture of respect and friendship.  Accordingly, we would be willing to accept $475,000 now and defer $100,000 for 6 months and the last $100,000 for 12 months.

I know this is not as aggressive a proposal as you were hoping for, but I hope you will agree that it is a reasonable gesture under the circumstances.

Thanks, Sandy.  I look forward to hearing back from you.

Mike

---

Michael A. O'Hara | Consensus | 73 Newbury Street, Boston, MA 02116
Direct: +1.617.437.6510 | Main: +1.617.437.6500 | Mobile: +1.781.354.2281 | Fax: +1.617.437.6506
mohara@consensusadvisors.com | www.consensusadvisors.com | Boston ∞ New York

**From:** Betsy White
**Sent:** Friday, April 18, 2014 9:27 AM
**To:** Michael O'Hara
**Subject:** Conway Invoice

---

Betsy White | Consensus | 73 Newbury Street, Boston, MA 02116
Direct: +1.617.437.6565 | Main: +1.617.437.6500 | Mobile: +1.508.287.0913 | Fax: +1.617.437.6506
bwhite@consensusadvisors.com | www.consensusadvisors.com | Boston ∞ New York ∞ London